**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joel D. Smith (State Bar No. 244902)
Blair E. Reed (State Bar No. 316791)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail:  ltfisher@bursor.com
            jsmith@bursor.com
            breed@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
2665 S. Bayshore Dr., Suite 220
Miami, FL 33133
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-Mail: scott@bursor.com

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY YANG and GABRIELA SOLANO, individually and on behalf of all others similarly situated, | Case No. 4:19-CV-05811-HSG |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| LIFETECH RESOURCES LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiffs Kimberly Yang and Gabriela Solano ("Plaintiffs"), by their undersigned attorneys, bring this action on behalf of themselves and all others similarly situated against Defendant Lifetech Resources LLC d/b/a Skin Research Laboratories® ("Lifetech" or "Defendant").  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     This is a putative class action lawsuit on behalf of purchasers of Defendant's lash and brow enhancing serums, neuLASH® ("neuLASH") and neuBROW® ("neuBROW") (collectively, the "Products"), which are deceptively labeled and marketed because Defendant fails to disclose the serious and potentially harmful side effects linked to an ingredient contained in the Products.

2.     As part of the Defendant's packaging, Defendant markets both neuLASH and neuBROW as treatments that are "grounded in science," and as "gentle" and "effective" ways to "address the weakening and loss of the lashes and brows."  Defendant further states that it "brings a scientific approach to beauty" by combining "radical technology with potent blends of essential proteins, vitamins and rejuvenating ingredients to create targeted skincare treatments" and represents its Products as "clinically-proven solutions."

3.     Defendant manufactures, distributes, markets, advertises, sells, and labels neuLASH and neuBROW as cosmetic eyelash and eyebrow enhancing serums that promote youthful and luxurious looking brows and lashes.  Upon information and belief, the Products share substantially similar ingredients and/or chemical compositions.  The Products' packaging is nearly identical:



4. However, since the Products have been on the market, Defendant has failed to disclose material facts to consumers about the existence and severity of symptoms and side effects of isopropyl cloprostenate ("ICP"), a synthetic prostaglandin analog and active ingredient in the Products.

5. Prostagladin analogs are chemicals manufactured to be biologically equivalent to the lipid compound prostaglandin. Prostaglandin analogs are commonly used as topical prescriptions in the medical treatment and management of glaucoma to reduce elevated intraocular pressure.[1] Prostaglandin analogs are also believed to contribute to eyelash growth. However, there are severe side effects associated with prostaglandin analogs, including eye color change, darkening of eyelid skin, droopy eyelids, sunken eyes, stinging, eye redness, and itching.[2] Notwithstanding these undesirable and serious side effects, the hair-growth enhancing properties of prostaglandin analogs

---

[1] *See* https://www.glaucoma.org/treatment/medication-guide.php (last visited Sep. 17, 2019).
[2] *Id.*

1  has led to the development of products containing prostaglandin analogs for the purpose of eyelash

2  enhancement.   But due to the side effects associated with the use of prostaglandin analogs,

3  manufacturers of products containing prostaglandin analogs are usually required to disclose those

4  serious and potentially harmful side effects.

5       6.   As mentioned above, Defendant's Products contain isopropyl cloprostenate, "a

6  synthetic prostaglandin analog in the same class of compounds as the active ingredient in FDA-

7  approved drugs indicated to lower intraocular pressure in glaucoma patients." [3]

8       7.   Indeed, in 2011, the Food and Drug Administration ("FDA") sent Defendant a warning

9  letter regarding its Products containing ICP.  The letter stated that ICP is an "Unapproved New Drug

10  and Misbranded Drug" and that Defendant's Products are "Adulterated and Misbranded Cosmetic[s]"

11  because "***their labeling is misleading in that it fails to reveal facts material with respect to***

12  ***consequences that may result from the use of the products under the conditions of use prescribed***

13  ***in the labeling.***"[4]

14       8.   Referring to Defendant's use of ICP, the FDA's letter also admonished Defendant that

15  the "FDA had determined that drug products in the same class as ***the active ingredient***

16  ***in…'NeuLash', and 'NeuveauBrow' cannot be used safely without the direction, or under the***

17  ***supervision of a licensed medical practitioner***."[5]

18       9.   Despite marketing its Products as "[c]linically proven safe, gentle, and effective"

19  cosmetics, Defendant knew that its Products contained ICP, and thus Defendant should have disclosed

20  any side effects associated with that ingredient.[6]

21

22

---

23  [3] Alonza E. Cruse, *Warning Letter*, U.S. Food & Drug Admin. (Apr. 18, 2011),

24  https://wayback.archive-it.org/7993/20170111100914/http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2011

25  /ucm251951.htm, attached hereto as Exhibit A.
   [4] *Id.* (emphasis added)

26  [5] *Id.* (emphasis added)

27  [6] This action does not allege that the Products are subject to FDA regulation or should have been regulated by the FDA.  Additionally, nowhere on the Products' packaging does it purport to have FDA registration or approval, as it is an over-the-counter cosmetic product.

28

---

10.     Numerous consumers of the Products have experienced the side effects described herein.  Even after learning of these consumer complaints—and long after the FDA warned Defendant about this issue—Defendant continued to and currently uses ICP in its Products without disclosing any of the side effects that may occur when using a product containing ICP.  Thus, rather than allowing consumers to decide whether the Products are worth purchasing and using in light of serious and potentially harmful side effects, Defendant decided to conceal those risks in pursuit of profit.

11.     On information and belief, Defendant has profited enormously from its false and misleading marketing and labeling of the Products, which retail between $95.00 and $150.00. Plaintiffs, along with putative class members, were harmed because they paid retail price for the Products without knowing the truth about the Products' risks before purchasing them.

12.     Plaintiffs relied on Defendant's false and misleading marketing for the Products and would not have purchased the Products had they known of the unsafe side effects.  Plaintiffs bring this class action on behalf of themselves and other purchasers of Defendant's Products and asserts claims against Defendant for violations of the California's Consumers Legal Remedies Act, California's False Advertising Law, California's Unfair Competition Law, and unjust enrichment.

## **FACTUAL BACKGROUND**

13.     Unlike prescription drugs, cosmetics may be marketed and labeled in the United States without FDA approval.  Even though Defendant markets and labels its Products as cosmetics that lengthen and enhance the appearance of eyelashes and eyebrows, Defendant is still required to comport with applicable state and federal laws relating to consumer protection.  Under these laws, Defendant is required to disclose material facts to consumers who may purchase the Products, including the side effects associated with ICP.

//

//

//

//

//

14.     Defendant lists isopropyl cloprostenate as an ingredient in both neuLASH and neuBROW.  Below are pictures of the ingredient lists on the packaging of neuLASH (top) and neuBROW (bottom):

15.  ["I]sopropyl cloprostenate is a synthetic prostaglandin analog in the same class of compounds as the active ingredient in FDA-approved drugs indicated to lower intraocular pressure in glaucoma patients."[7]  The FDA has previously warned Defendant that marketing eyelash growth serums containing the active ingredient isopropyl cloprostenante violates the Food, Drug, and Cosmetic Act because the Products contained unapproved new drugs and, as a result, were misbranded.[8]  The FDA also noted the harmful side effects associated with prostaglandin analogs: "[*o]ther potential adverse events associated with prostaglandin analogs for ophthalmic use include ocular irritation, hyperemia, iris color change, macular edema, ocular inflammation, and interference with glaucoma therapy.  In addition, prostaglandin analogs for ophthalmic use are currently classified as Pregnancy Class C.*"[9]

16.  Prior to 2014, drugs were classified as "Pregnancy Category C" when: (1) animal reproduction studies showed the drugs had an adverse effect on fetuses and there were no adequate and well controlled studies of its effect on humans, but potential benefits nevertheless warranted use of the drug in pregnant women, despite potential risks; and (2) in the absence of both animal reproduction studies and adequate, well controlled studies in humans.[10]  In 2014, the FDA removed the letter class system and enacted the Pregnancy and Lactation Labeling Rule ("PLLR"), which requires that more descriptive information be given to pregnant women and nursing mothers, "thus allowing them to make informed and educated decisions for themselves and their children."[11]

17.  Defendant does not disclose the majority of risks associated with ICP or its classification as a Category C drug.  Defendant also fails to provide any meaningful information for pregnant women and nursing mothers about the side effects of ICP when advertising, marketing, labeling, distributing, and selling the Products.

//

---

[7] Ex. A, *Warning Letter*.
[8] *Id.*
[9] *Id.* (emphasis added)
[10] *See* https://www.drugs.com/pregnancy-categories.html (last visited Sep. 17, 2019).
[11] *See* https://www.fda.gov/vaccines-blood-biologics/biologics-rules/pregnancy-and-lactation-labeling-final-rule (last visited Sep. 17, 2019).

**Use Of Prostaglandin Analogs**

18.    Prostaglandin analogs are powerful prescriptions used for the treatment of elevated intraocular pressure due to glaucoma.[12]  Prostaglandin analogs are prescribed to glaucoma patients in the form of eyedrops to prevent the advancement of glaucoma.[13]   Glaucoma is a serious and potentially blinding ocular disease.

19.    While consumers may decide the risk of serious and adverse side effects are worthwhile in a prescription drug that can manage a disease that can cause blindness while under the supervision of a doctor, a reasonable consumer may not find those same risks to be worthwhile when they are associated with a product designed to enhance the appearance of eyelashes and eyebrows. By failing to disclose those risks to Plaintiffs and consumers, Defendant deprived Plaintiffs and consumers of the ability to make that assessment in the first place.

20.    Despite the risks associated with them, Prostaglandin analogs can cause hair growth and are used in products that target lash growth such as Latisse.  Like the Products, Latisse contains a prostaglandin analog and is marketed as a lash enhancing serum.  However, unlike the Products, Latisse is an FDA approved drug that provides extensive warnings, precautions (including the fact that Latisse was classified as a Pregnancy Category C drug), a list of potential adverse reactions, and detailed instructions on use.[14]

21.    For example, Latisse warns of effects on intraocular pressure, lid pigmentation, hair growth outside the treatment area, eye inflammation, macular edema, and iris pigmentation changes.[15]

**Defendant's Failure To Disclose ICP's Risks And Side Effects**

22.    In contrast to Latisse's careful warnings about all of the dangers and potentially permanent side effects associated with the prostaglandin analog it contains, Defendant's Products barely contain any warnings at all, despite listing and containing ICP as an ingredient.  Defendant uses nearly identical packaging for both neuLASH and neuBROW, including using the same

---

[12] *See* https://www.glaucoma.org/treatment/medication-guide.php (last visited Sep. 17, 2019).
[13] *Id.*
[14] *See* https://www.latisse.com/AboutLatisse.aspx (last visited Sep. 17, 2019); *see also* https://www.allergan.com/assets/pdf/latisse_pi.pdf (last visited Sep. 17, 2019).
[15] *Id.*

inadequate warning.  On the outside packaging of the Products, Defendant simply says "CAUTION: For external use only.  Avoid direct contact with the eye.  If irritation occurs, rinse with cool water and discontinue use.  Consult with your physician if you are pregnant or nursing, being treated for any eye-related disorder or actively undergoing cancer treatment.  Keep out of reach of children.":



23.     Defendant's only precaution on the outside packaging is to "[c]onsult with your physician if you are pregnant or nursing, being treated for any eye-related disorder or actively undergoing cancer treatment."  This warning is inadequate at best and does not allow consumers to make informed and educated decisions for themselves or their children (if pregnant or nursing).  Likewise, Defendant's disclosure that consumers should stop use if irritation occurs is inadequate in light of the serious and potentially harmful side effects associated with ICP and fails to inform consumers of the Products' risks.

24.     On the inside pamphlet of the Products, there are no warnings whatsoever.  The pamphlet contained inside of the neuLASH and neuBROW packaging is identical and lists instructions for using both products.  The same sparse instructions are repeated in 15 different languages.

25.     With regard to neuLASH, the pamphlet only says "[a]pply every other day if a mild tingling sensation occurs":

//

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:19-CV-05811-HSG

8

# neuLASH®

**Lash Enhancing Serum**

This nutrient-rich formula delivers benefits beyond conditioning. Fortified with Active Eyelash Technology®, it helps short, brittle, thin or sparse eyelashes achieve dramatic improvements in appearance in just 30 days.

The transformation begins with moisture. Sodium hyaluronate, known for its ability to hold 1000 times its weight in water, saturates the lashes in hydration, boosting softness, elasticity and shine.

Created with a proprietary combination of amino acids, bioengineered polypeptides help strengthen and protect the lashes. Biotin, an essential B vitamin adds to this effect, fortifying lashes against further damage.

Panthenol replenishes and renews, enhancing flexibility and resilience for a full, thick and healthy appearance. Pumpkin seed extract helps lashes look more voluminous than ever.

When lashes reach their full potential, a look of volume, curl and luster is revealed.



**Usage**

Apply nightly to the base of the upper eyelashes. Continue using neuLASH® to maintain the condition and appearance of your lashes once desired results are achieved. Apply every other day if a mild tingling sensation occurs.

FIRST AMENDED CLASS ACTION COMPLAINT                    9
CASE NO. 4:19-CV-05811-HSG

26.     With regard to neuBROW, the pamphlet does not provide any attempt at a warning:

## neuBROW®

**Brow Enhancing Serum**

This potent serum is formulated with an exclusive Dual-Weight Protein Complex™ that replenishes and protects the brows, promoting strength, suppleness and shine. It delivers fuller-looking, more defined eyebrows in 3 to 4 weeks.

Keratin moisturizes and conditions to support sparse, undernourished and aging brows. Sweet almond protein creates a protective layer, bringing softness and brilliance to the brow line.

Bioengineered polypeptides, a proprietary combination of amino acids, help rejuvenate the brows, enhancing their overall appearance. Biotin, an essential nutrient with fortifying benefits, helps protect brows from further damage.

Apple stem cell extract encourages a look of vitality. The result is shapely, fuller-looking, more defined brows – and a healthier appearance.

  

**Usage**

Apply to the browline each morning and evening using brow brushes to maximize results. Allow to dry before grooming brows. Continue using several times a week once visible results are achieved.

27.     On Defendant's website, there are no disclosures of the serious and potentially harmful side effects associated with ICP, or even that ICP is present in the Products.[16]  Defendant simply states, in an "FAQ" page away from the Products' webpages, that if irritation or tingling occurs that a physician should be contacted and that pregnant or nursing women should not use the Products.[17]

28.     On Nordstrom's website, where Plaintiff Yang purchased neuLASH, and in the Nordstrom store, where Plaintiff Solano purchased neuLASH, there are no disclosures of the serious and potentially harmful side effects associated with ICP, or even that ICP is present in the Products.[18]

29.     Instead of disclosing the serious and potentially harmful side effects associated with its Products, Defendant marketed and advertised the Products as ways to get "[l]uxurious lashes" (neuLASH, bottom) and to fulfill consumers' "dream to have fuller-looking brows" (neuBROW, top)[19]:

# Benefits

Your dream to have fuller-looking brows stops here. With a potent serum that has been proven, year after year, your brows will never look better, and you will never feel sexier.

neuBROW is exclusively formulated with Dual-Weight Protein Complex™ to promote suppleness and shine, while restoring the appearance of youthful-looking brows.

Say goodbye to sparse-looking brows and hello to beautiful, fuller-looking brows.

**New Limited Edition 2 ml neuBROW on sale now!**

---

[16] *See* https://skinresearchlabs.com/collections/neulash-collection/products/neulash-lash-enhancing-serum-6-ml (last visited Sep. 17, 2019); *see also* https://skinresearchlabs.com/collections/brow-collection/products/neubrow-brow-enhancing-serum (last visited Sep. 17, 2019).

[17] *See* https://skinresearchlabs.com/pages/faqs (last visited Sep. 17, 2019).

[18] *See* https://shop.nordstrom.com/s/neulash-lash-enhancing-serum/5094852?origin=category-personalizedsort&breadcrumb=Home%2FBrands%2FneuLASH%C2%AE&color=none (last visited Sep. 17, 2019); *see also* https://shop.nordstrom.com/s/neubrow-brow-enhancing-serum/5094932?origin=category-personalizedsort&breadcrumb=Home%2FBrands%2FneuLASH%C2%AE&color=none (last visited Sep. 17, 2019).

[19] *See* https://skinresearchlabs.com/collections/neulash-collection/products/neulash-lash-enhancing-serum-6-ml (last visited Sep. 17, 2019); *see also* https://skinresearchlabs.com/collections/brow-collection/products/neubrow-brow-enhancing-serum (last visited Sep. 17, 2019).

# Benefits

Luxurious lashes can be yours. This nutrient-rich formula delivers benefits beyond conditioning. neuLASH® is fortified with Active Eyelash Technology® to dramatically improve the weak appearance of eyelashes in just 30 days.

The transformation begins with moisture. Sodium hyaluronate, known for its ability to hold 1000 times its weight in water, saturates the lashes in hydration, boosting softness, elasticity and shine. Created with a proprietary combination of amino acids, bioengineered peptides help promote the look of strength and protect the lashes. Biotin, an essential B vitamin adds to this effect, fortifying lashes against further damage. Panthenol moisturizes to improve lash flexibility and durability. Pumpkin seed extract nourishes the lashes and helps lashes look more luxurious than ever.

30.   In addition, Defendant actually represents the Products as safe to use because they have "been ophthalmologist and dermatologist tested and found to be safe and non-irritating."[20]

31.   Consumers are entitled to make knowing and intelligent decisions about the products they purchase.  As common-sense dictates, Defendant's material omissions are deceptive marketing practices designed to retain as much profits from unknowing consumers as possible.

32.   Defendant's failure to properly label the Products has deprived Plaintiffs and all consumers of the information they needed, and deserved, to make an informed decision about whether to purchase the Products.

33.   Defendant's sparse warning label on the outside of the Products' packaging and inside pamphlet is deceptive, misleading, and unlawful.  It fails to warn individuals of adverse side effects associated with ICP, a prostaglandin analog.  A reasonable consumer reading this warning would not know, based on the information provided by Defendant, about the actual severity of any adverse side effects and would reasonably conclude that the product was safe and non-irritating.

34.   The adverse side effects that Plaintiffs experienced were not adequately disclosed.

---

[20] *See* https://skinresearchlabs.com/pages/faqs (last visited Sep. 17, 2019).

1    **Online Consumer Complaints About The Products**

2    35.     Consumers who used the Products and were not warned about the adverse side effects

3    before purchasing and/or using it have complained on Defendant's own website as well as other

4    retailers' websites.

5    36.     For example, the following complaints about neuLASH were left on Defendant's own

6    website on the neuLASH product page:

7    ★☆☆☆☆

8    Not great!

9    *LadyV2013 on Dec 24, 2014*

10   Not great, irritated eyes, foggy eyes. Did not like!

11

12   37.     Another user complained on Defendant's own website regarding neuBROW:

13   ★☆☆☆☆

14   reaction to product

15   *maggiem12 on Jul 09, 2016*

16   Not for sensitive skin, my skin turned red after a few uses, thus my eyebrows looked red.

17

18   38.     Yet more consumers left negative reviews on the product page for neuLASH at

19   DermStore.com regarding the Product's harmful side effects.  A consumer even brought attention to

20   a "harmful drug," likely referring to ICP, in Defendant's Products:

21

22   Skin Type: **Sensitive**
     Skin Tone: **Medium**          **Bad Product!**

23                                  My lashes fell out after 8 weeks of use. My eyes are red and sunken. This product contains a harmful
                                    drug. Do the research.

24   from Nashville, TN
     **Verified Purchaser**                          1 person **found this helpful** | Mark as helpful

25   2/18/2018

26

27   //

28

---

FIRST AMENDED CLASS ACTION COMPLAINT                                          13
CASE NO. 4:19-CV-05811-HSG

39.     One consumer who negatively reviewed neuLASH on MakeUpAlley.com even indicated that she had to go to the emergency room.  Additionally, she alerted Defendant of the issues with the Products, to which Defendant's response was "rude and hateful":



**1.0** 🍶🍶🍶🍶🍶 from **Beautyisfun**  Oct/03/2015

If it were possible to give negative stars, I would. After using this product, I have an $1100 bill for the emergency room and eye drops and ointment. Tried to call the company to let them know about the issue. I simply wanted to let them know this product may have some issues. They were rude and hateful. The worst customer service experience ever. By the way, this item was purchased at the department store where I am employed as an assistant manager. I certainly won't recommend this product to others. Less

♡ Favorite | ⚑ Flag

13 of 13 people found this helpful. Did you?

| Yes | No |

About reviewer (2 reviews)

Age  36-43

Skin  Oily, Fair-Medium

Hair  Brunette

Eyes  Blue

40.     Consumers of the neuLASH complained of "eye irritation" on Amazon.com:



Amazon Customer

★☆☆☆☆ **Product did not work, ZERO visible difference!**
May 23, 2019
Size: 0.2 fl. oz. | **Verified Purchase**

Didn't work for me!!! Purchased Neulash to hopefully grow or gain something on my lashes for my daughter's upcoming wedding. I used the product daily (per instructions) for six weeks plus — NOTHING! They only reaction I got was some eye irritation! It was a complete waste of money and time. ZERO visible difference in any way. (Ended up having false eyelashes put on for the wedding to make my lashes look better.)

4 people found this helpful

| Helpful | ⌄ Comment | Report abuse

Davi Mayfield

★★☆☆☆ **Two Stars**
May 13, 2014
Size: Large | **Verified Purchase**

returned because it burns my eyes :(

One person found this helpful

| Helpful | ⌄ Comment | Report abuse

//

//

41.     Consumers of neuLASH also complained of eye irritation and redness on www.BestEyelashGrowthSerumsReviews.com:

Kristin. H

Not Good For Sensitive Skin Used for the first time last night, if you have sensitive skin do not even try this. My skin burnt so badly it's all red around my eye. I used a small drop as stayed in directions & woke up looking like I was on drugs with red, puffy eyes.

★★☆☆☆

Grace. R

Waste of Money This product was a total waste of money. It didn't improve my lashes and worst still makes my eyes red and itching.

★★☆☆☆

Debbie L

Makes my eyes itch & burn

★☆☆☆☆

Kenneth D

The ingredients are dangerous and toxic. Look it up. You do not want it on your skin much less your eyes.

★★☆☆☆

42.     The above reviews are just a sampling of numerous negative reviews consumers have left about Defendant's Products and the serious and potentially harmful side effects associated with the Products.

43.     Like most companies who offer customers an opportunity to post reviews on their websites, Defendant regularly monitors on-line customer reviews because they provide valuable data regarding quality control issues, customer satisfaction and marketing analytics.  Regularly and thoroughly monitoring reviews is also standard business practice for managing the company's on-line reputation.  And, like most companies, Defendant pays particular attention to poor and/or

negative reviews like those copied above because extreme reviews are sometimes the result of extreme problems, and Defendant is sensitive to the reputational impact of negative on-line reviews. As a result of this policy, Defendant's management was aware of the above-referenced consumer complaints shortly after each complaint was posted.

44.     Defendant's management pays close attention when customers make similar complaints about a product, because that indicates the complaints are not the result of user error or an anomalous incident, but instead a systemic problem with the product.  Defendant also knows that when there are many similar complaints from customers, then it is often the case that for every person who complains about a defect, there are other people who experienced the same defect but who did not complain.  Here, the reports and complaints from consumers were similar enough, and numerous enough, to put Defendant on notice that the incidents described were the result of failing to disclose serious and harmful side effects and risks associated with use of the Products.

45.     The failure to disclose the serious and potentially harmful side effects described herein is a material omission which Defendant had exclusive knowledge of and which was not known to Plaintiffs or class members.

46.     Defendant made partial representations to Plaintiffs and class members while suppressing the serious and potentially harmful side effects associated with use of the Products. Specifically, by displaying the Products and describing its features and use, the product packaging implied that the Products had no serious or potentially harmful side effects, without disclosing that the Products indeed did have serious or potentially harmful side effects because they contain ICP.

**THE PARTIES**

47.     Defendant **Lifetech Resources LLC** d/b/a Skin Research Laboratories® ("Lifetech") is a California corporation with its headquarters located at 700 Science Drive, Moorpark, CA 93021. Lifetech manufactures, sells, and globally distributes cosmetic products nationwide, and is responsible for the advertising, marketing, and packaging of cosmetic eyelash and eyebrow enhancing serums, including the Products.

48.     Plaintiff **Kimberly Yang** is a California resident who resides in Emeryville, California.  On or around April 21, 2017, Ms. Yang purchased neuLASH from Nordstrom.com for $150.00, which was then delivered to her home in Emeryville.  Prior to using neuLASH, Ms. Yang was not pregnant or nursing, was not being treated for any eye-related disorder, or actively undergoing cancer treatment.  Before purchasing neuLASH, Ms. Yang reviewed product information, packaging, and images, which did not disclose that the Products could cause eye color change, darkening of eyelid skin, droopy eyelids, ocular inflammation, macular edma and distorted vision, sunken eyes, stinging, eye redness and hypermia, and itchy eyes, or that an ingredient contained in the Products was previously classified as a Category C pregnancy drug.  Ms. Yang understood neuLASH's packaging, labels, and marketing materials as representations by Defendant that neuLASH was safe for use and would not have serious and potentially harmful side effects.

49.     After using neuLASH, Ms. Yang experienced severe irritation as well as itchy eyes and darkening of the skin on her eyelid.  Had Ms. Yang been aware of these possible side effects before purchasing neuLASH, she would not have purchased or used the product.  However, Ms. Yang remains interested in purchasing a safe lash enhancement serum and would consider neuLASH in the future if Defendant removed any prostaglandin analogs.

50.     Plaintiff **Gabriela Solano** is a California resident who resides in Sacramento, California.  On or around December 1, 2019, Ms. Solano purchased neuLASH from Nordstrom in Roseville, California for $95.00.  Prior to using neuLASH, Ms. Solano was not pregnant or nursing, was not being treated for any eye-related disorder, or actively undergoing cancer treatment.  Before purchasing neuLASH, Ms. Solano reviewed product information, packaging, and images, which did not disclose that the Products could cause eye color change, darkening of eyelid skin, droopy eyelids, ocular inflammation, macular edma and distorted vision, sunken eyes, stinging, eye redness and hypermia, and itchy eyes, or that an ingredient contained in the Products was previously classified as a Category C pregnancy drug.  Ms. Solano understood neuLASH's packaging, labels, and marketing materials as representations by Defendant that neuLASH was safe for use and would not have serious and potentially harmful side effects.

51.     After using neuLASH, Ms. Solano experienced eye irritation, including itchy eyes. Had Ms. Solano been aware of these possible side effects before purchasing neuLASH, she would not have purchased or used the product.  However, Ms. Solano remains interested in purchasing a safe lash enhancement serum and would consider neuLASH in the future if Defendant removed any prostaglandin analogs.

## JURISDICTION AND VENUE

52.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A). There are more than 100 Class members, and the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs.  At least one Class member is a citizen of a state different than at least one defendant.

53.     This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.

54.     This Court has personal jurisdiction over Lifetech Resources LLC because it is a California corporation registered with the California Secretary of State to conduct business within California.  In addition, it maintains its headquarters in and conducts substantial business within California.

55.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant transacts significant business within this District and because Plaintiff Yang purchased and used neuLASH in this District.

## CLASS ACTION ALLEGATIONS

56.     Plaintiffs seek to represent a class defined as all persons in the United States who purchased the Products at any time from September 17, 2015 to the present (the "Class").  Excluded from the Class are governmental entities, Defendant, Defendant's affiliates, parents, subsidiaries, employees, officers, directors, and co-conspirators, and anyone who purchased the Products for resale.  Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

57.     Plaintiffs also seek to represent a subclass defined as all members of the Class who purchased the Products within the state of California (the "California Subclass") at any time from September 17, 2015 to the present.

58.     Members of the Class and the California Subclass are so numerous that their individual joinder herein is impracticable.   The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery of Defendant's records. Class members may be notified of the pendency of this action by mail, email, and/or publication.

59.     Plaintiffs reserve the right to modify or expand the definition of the Class and Sub-Class to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

60.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.   These common legal and factual questions include, but are not limited to:

a.      Whether the marketing, labeling, and advertisements for the Products included false and/or misleading statements;

b.      Whether Defendant's conduct violated the CLRA;

c.      Whether Defendant's conduct violated the FAL;

d.      Whether Defendant's conduct violated the UCL;

e.      Whether Defendant continues to unlawfully conceal or make partial representations concerning the side effects of the Products; and

f.      Whether Defendant should have made representations to consumers on its labeling and packaging.

61.     Plaintiffs' claims are typical of the claims of the proposed Class and of the California Subclass she seeks to represent.   Each Class member was subjected to the same illegal conduct, was harmed in the same way and has claims for relief under the same legal theories.

62.     Plaintiffs Yang and Solano are adequate representatives of the Class and of the California Subclass they seek to represent because their interests do not conflict with the interests of

the Class members they seeks to represent, they have retained counsel competent and experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Class and Subclass members will be fairly and adequately protected by Plaintiffs and their counsel.

63. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of a defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

64. Unless a class is certified, Defendant will retain monies received as a result of its conduct that were taken from Plaintiffs and proposed Class members. Unless a class-wide injunction is issued, Defendant will continue to commit the violations of law alleged, and the members of the Class and the general public will continue to be harmed thereby.

## COUNT I

### Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*

65. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

66. Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclass.

67. Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does

not have."  Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

68.     Defendant violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by making false, and misleading statements by holding out the Products as having no serious side effects.  By including a warning in its labeling, but failing to disclose serious side effects, Defendant is effectively saying that there are no serious side effects.  A reasonable consumer would believe that a cosmetic's warning label would contain all material warnings about any risks of use.

69.     Defendant's concealment and omissions regarding the adverse side effects of the Products was a material omission and misstatement that would cause consumers to believe, falsely and incorrectly, that the Products were safe to use and had no potential, risky, and serious side effects.

70.     Plaintiffs and the members of the California Subclass have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid.

71.     On August 8, 2019, a CLRA demand letter was sent to Defendant via certified mail that provided notice of Defendant's violation of the CLRA and demanded that within thirty (30) days from that date, Defendant correct, repair, replace or other rectify the unlawful, unfair, false and/or deceptive practices complained of herein.  The letter also stated that if Defendant refused to do so, a complaint seeking damages in accordance with the CLRA would be filed.  Defendant failed to take corrective action.

## **COUNT II**

### **Violation of California's False Advertising Law ("FAL"),**
### **Business & Professions Code § 17500 *et seq*.**

72.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

73.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and California Subclass.

74.     Defendant violated Business & Professions Code § 17500 by publicly disseminating false, misleading, and deceptive advertisements regarding its Products by failing to disclose material facts to consumers about the existence and severity of symptoms and adverse side effects associated with using the Products.

75.     Defendant's false and misleading advertisements were disseminated to increase the sales of its Products.

76.     Defendant should have known and did actually know that its advertisements for the Products were false, misleading, and deceptive because it knew about the existence and severity of symptoms associated with using the Products and failed to disclose them.  Defendant knew its advertisements would induce consumers to purchase the Products.

77.     Plaintiffs and the members of the Class and California Subclass have suffered harm as a result of these violations of the FAL because they have incurred charges and/or paid monies for Products that they otherwise would not have incurred or paid.

## COUNT III

**Unlawful Business Practices In Violation of California's Unfair Competition Law ("UCL"), Business & Professions Code §§ 17200 *et seq*.
(Unlawful Practices)**

78.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

79.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and on behalf of the California Subclass.

80.     By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210 by engaging in unlawful, fraudulent, and unfair conduct.

81.     Defendant has violated the UCL's proscription against engaging in *unlawful* conduct as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged above.

82. Defendant's acts and practices described above also violate the UCL's proscription against engaging in *fraudulent* and deceptive conduct.

83. As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Products is likely to deceive reasonable consumers.

84. Defendant's acts and practices described above also violate the UCL's proscription against engaging in *unfair* conduct.

85. Plaintiffs and the members of the Class and Subclass have suffered harm as a result of the violations of the UCL because they have incurred charges and/or paid monies for Products they otherwise would not have incurred or paid.

86. There is no benefit to consumers or competition from deceptively marketing and labeling the Products.

87. Plaintiffs and the other Class and Subclass members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

88. The gravity of the consequences of Defendant's conduct as described above outweighs any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and the other members of the Class and Subclass.

89. Defendant's violations of the UCL continue to this day.

### COUNT IV
### Unjust Enrichment

90. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

91. Plaintiffs bring this claim individually and on behalf of members of the Class and California Subclass against Defendant.

92.     Plaintiffs and Class members conferred benefits on Defendant by purchasing the Products.

93.     Defendant has knowledge of such benefits.

94.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class members' purchases of the Products.  Retention of those monies under these circumstances is unjust and inequitable because Defendant failed to disclose that the Products have harmful and serious side effects.

95.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiffs and the Class members for their unjust enrichment, as ordered by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment on behalf of themselves and members of the Class and California Subclass as follows:

a.      For an order certifying the Class and the California Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the Class and California Subclass and Plaintiffs' attorneys as Class Counsel to represent the Class and California Subclass members;

b.      For an order declaring that Defendant's conduct violates the statutes referenced herein;

c.      For an order finding in favor of Plaintiffs, the Class, and the California Subclass on all counts asserted herein;

d.      For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e.      For injunctive relief enjoining the illegal acts detailed herein;

f.      For prejudgment interest on all amounts awarded;

g.      For an order of restitution and all other forms of equitable monetary relief;

h.      For an order awarding Plaintiffs and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit.

1

## <u>JURY TRIAL DEMANDED</u>

2     Plaintiffs demand a trial by jury on all claims so triable.

3

4   Dated: January 6, 2020               Respectfully submitted,

5                                        **BURSOR & FISHER, P.A.**

6

7                                        By: _/s/ L. Timothy Fisher_____
                                            L. Timothy Fisher
8

9                                        L. Timothy Fisher (State Bar No. 191626)
                                         Joel D. Smith (State Bar No. 244902)
10                                       Blair E. Reed (State Bar No. 316791)
                                         1990 North California Boulevard, Suite 940
11                                       Walnut Creek, CA 94596
                                         Telephone:  (925) 300-4455
12                                       Facsimile:  (925) 407-2700
                                         E-Mail: ltfisher@bursor.com
13                                               jsmith@bursor.com
                                                 breed@bursor.com
14

15                                       **BURSOR & FISHER, P.A.**
                                         Scott A. Bursor (State Bar No. 276006)
16                                       2665 S. Bayshore Dr., Suite 220
                                         Miami, FL 33133
17                                       Telephone: (305) 330-5512
                                         Facsimile:  (305) 676-9006
18                                       E-Mail: scott@bursor.com

19

20                                       *Counsel for Plaintiffs*

21

22

23

24

25

26

27

28

1

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

2      I, L. Timothy Fisher, declare as follows:

3      1.      I am an attorney at law licensed to practice in the State of California and a member

4  of the bar of this Court.  I am a Partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs in

5  this action.  I have personal knowledge of the facts set forth in this declaration and, if called as a

6  witness, I could and would competently testify thereto under oath.

7      2.      The Complaint filed in this action is filed in the proper place for trial under Civil

8  Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in

9  the Northern District of California.

10      I declare under the penalty of perjury under the laws of the State of California and the

11  United States that the foregoing is true and correct and that this declaration was executed at Walnut

12  Creek, California this 6th day of January, 2020.

13

14                                             */s/ L. Timothy Fisher*

15                                             L. Timothy Fisher

16

17

18

19

20

21

22

23

24

25

26

27

28